## [No. 1709.]

### SEABORNE GREENE *v.* THE STATE.

17b 395<br>34 281

1. EVIDENCE— CONFESSIONS — CASE OVERRULED.— It is a common law rule that when a confession or admission is introduced in evidence against a party, such party is entitled to prove the whole of what he said on the subject at the time of making such confession or admission. But article 751 of the Code of Criminal Procedure expands such common law rule, with reference to such evidence, so as not to restrict the explanatory act, declaration, conversation or writing to the *time* when the act, declaration, conversation or

writing sought to be explained occurred, and to extend it so as to render such acts or statements admissible, if necessary to a full understanding of, or to explain the acts or statements introduced in evidence by the adverse party, although the same may have transpired at a different time, and at a time so remote even, as to not be admissible as *res gestæ*. In so far as the rule announced in *Shrivers's* case, 7 Texas Ct. App., 450, conflicts with this doctrine, that case is overruled. See the opinion *in extenso* for the written explanations of his confession by a defendant on trial for murder *held* to come within the rule, and, therefore, to have been improperly excluded.

2. Practice — Charge of the Court.— Obnoxious charges of the court should be excepted to at the time they are given.

3. Same — Privilege of Counsel.— Prosecuting counsel should not be permitted to assert, in argument to the jury, that if an absent witness had been introduced he would have testified to certain facts, when adverse counsel had not invited such assertions.

Appeal from the District Court of Burleson. Tried below before the Hon. I. B. McFarland.

The conviction in this case was for murder of the second degree, and the penalty assessed against the appellant was a term of twenty-five years in the penitentiary. The homicide was alleged in the indictment, and shown by the evidence, to have been perpetrated in Burleson county, Texas, on the 2d day of June, 1882. Florence Pettis, a Mexican, was the person slain.

S. B. Glenn was the first witness for the State. He identified the defendant as Seaborne Greene, and testified that he was acquainted with the deceased in his life-time. The deceased was killed in Burleson county, Texas, on the 2d day of June, 1882. The defendant came to the house of the witness in the said county, on the evening of the said day, about one hour before sundown, and said to the witness: "I have killed my man, and have come to give up to you; you can do with me as you please." In response to the witness's questions, the defendant said that he had killed Florence Pettis, near the forks of the road, about three or four hundred yards west of William Barham's residence. Relating to the witness the circumstances of the killing, he said that he was on his way from William Barham's to his own house when he caught sight of a deer and followed it until he saw the deceased at the forks of the road. He called to the deceased, and the deceased threw himself to the right in his saddle, and he, the defendant, immediately fired and killed him. Witness asked him in what part of the body he shot the deceased, and he replied: "In the head, where I shoot everything." Witness then told the defendant to go to the house of William Krohne, a deputy sheriff, a half mile distant, and surrender to him. The defendant rode off in the direction of Krohne's house.

The witness then went to the place where the defendant said that he had killed the deceased, and found the dead body of the deceased just as the defendant said he would find it. The body lay on the right side of the road. Several gun-shot wounds, evidently made by common-sized buckshot, were seen by the witness, on the left shoulder, left side of the face and head, ranging backwards. From the range indicated by the wounds the party shooting must have fired from a point in front, and a little to the left of the deceased, as the latter went west along the road. The road in which the body lay ran east and west. Another road running northeast and southwest joined the first mentioned road at a point about twenty steps west of where the body of the deceased lay. The witness saw the mark of a shot on a tree about fifteen feet west of where the body lay, and about as high on the trunk as the head of a man on horseback would reach. This tree was near and on the left of the road going west. Witness reached the body of the deceased after dark, and found it in charge of Jack Barham and Jack Jones. Search of the body revealed no pistol. The body was coatless. The defendant had a double-barreled shot-gun when he came to witness's house that evening. It was the recollection of the witness that the defendant said that he shot the deceased with the gun, and that, when he hailed the deceased, the deceased said nothing.

Cross-examined, the witness testified that the deceased was a Mexican. When the defendant told the witness of the circumstances of the shooting, as detailed by the witness on his examination in chief, he said that when he, defendant, called to the deceased, the deceased made no reply, but threw himself to the right in his saddle, and threw his right hand behind him, when he, the defendant, fired and killed the deceased. The witness, as justice of the peace, held an inquest on the body of the deceased on the morning after the homicide. The defendant was present in the custody of Deputy-sheriff Krohne, and made before the witness a written statement concerning the killing. The witness had the body removed, on the night of the killing, from the road to William Barham's house, and held the inquest at a negro church some two or three hundred yards distant from the scene of the killing. It was the recollection of the witness that the defendant, in his first statement to the witness, said that he called to deceased: "Halloo Florence!" and that the deceased then made the movement described. Judging from the ground, the defendant at the time he fired must have been very near and to the left of the road, and the deceased must have been approaching him.

Re-examined, this witness stated that in January, 1882, the defendant came to him and said that two men had raped his step-daughter, Louisa Lawrence, and that he intended to kill them. He did not then say who the men were that committed the rape and whom he intended to kill. In April, 1882, in another conversation, the defendant told the witness that the deceased, Florence Pettis, had raped his step-daughter, and that he intended to kill him. Witness again repeated that in his statement to him about the killing, the defendant said that the deceased did not respond to his call, but threw himself around in his saddle and threw his hand behind him.

George A. Lewis was the next witness for the State. He testified that he was one of the jury of inquest that sat on the body of the deceased. He did not see the body until it had been removed to Barham's house. He saw the place where it was said that the killing occurred. He saw blood in the road, and about fifteen steps from this blood he saw the mark on a post-oak tree where it had been grazed by a shot. He saw the tracks of both men and horses about the ground. Quite a number of people were on the ground when the witness arrived. A clump of bushes stood on the north side of the road, about twenty-five or thirty feet from the blood spot, and there were quite a number of tracks, both of men and horses, about these bushes. The post-oak tree marked by the shot stood on the left of the road. The body of the deceased had two shots in the shoulder, one in the left jaw, and two or three in the left side of the head, all ranging backwards. The party who did the shooting must have been on the left side of the road.

William Barham, the next witness for the State, testified that in June, 1882, he lived on Davidson's creek in Burleson county, Texas, about two miles east from the defendant, whom he knew quite well. The defendant took dinner with the witness at the witness's house, about noon on the 2d day of June, 1882. Immediately after dinner the witness and the defendant started fishing, the defendant having his double-barreled shot-gun with him. He asked witness to exchange guns with him so that he could kill fish bait, saying that his gun was loaded with buckshot. They went fishing at a point about a mile distant from the witness's house. Failing to secure encouragement from the fish, they shortly quit fishing and started back towards witness's house. At the edge of the creek bottom, about a half mile from witness's house, the two separated, the defendant saying that he would go home, and the witness going to his bottom-field to work.

The deceased had passed the witness's house about 10 o'clock on that morning, going to Lyon's Station. He was on horseback and was in his shirt sleeves. He lived about eight miles distant from the witness's house. The witness did not live on the direct or usually traveled road from the deceased's house to Lyon's Station, but to the right of it. The witness next saw the deceased a little before sundown that evening. He was lying dead on the road about three hundred and fifty yards west from witness's house. He was lying face downward in a wagon rut on the right hand side of the road. Two roads lead off from the witness's house in a westerly direction. One of them led to the defendant's house, and the other in the direction of the point where the deceased's body lay. The body was in the road leading towards the deceased's house. A third road crosses the two roads described some three or four hundred yards distant from the witness's house, and the body of the deceased lay near the point of intersection. The witness found the deceased's horse about one hundred yards from the body. A sack containing a small quantity of flour, and the deceased's coat, was tied behind the saddle. The saddle was somewhat bloody. The defendant sent word by his little step-son to the witness that the witness would find the dead body of Florence Pettis, whom he had killed, at the point where the witness did find it.

Cross-examined, the witness stated that he was the first person to reach the body. He did not examine the body for weapons. He remained but a short time, leaving Jack Barham and Jack Jones with the body. He was not present when Glenn arrived. The defendant was not at the witness's house that morning at the time that the deceased was there.

Mrs. Mary Barham, the wife of the last witness, was the next witness to testify for the State. She stated that she was acquainted with both the deceased and the defendant in June, 1882. The deceased came to witness's house about 10 o'clock on the morning of June 2, 1882, on his way to Lyon's Station. He remained at the house about one hour. He had no coat on, and if he had weapons the witness did not see them. Some time after the deceased left, the defendant came to the house and remained until after dinner, when he and witness's husband went fishing. He had a double-barreled shot-gun with him. During the evening the deceased stopped at witness's house on his return from Lyon's Station, remaining an hour or two, sitting on the gallery with the witness. While the deceased was thus sitting on the gallery with the witness, the defendant rode up to the gate, and asked the witness where her

husband was. Witness replied that she did not know. Thereupon the defendant left, saying he would see the witness's husband on the morrow before the trial of a case in the justice's court in which he, defendant, was interested. During the time of the defendant's stay at the gate, he and the deceased were in full view of each other, and could easily see each other. They did not speak to each other. The gate at which the defendant stood was eight or ten steps from the gallery on which the deceased sat. The defendant had his gun across his lap. He rode off, taking the road towards his home. Within the next five minutes the deceased left, taking the road towards his home, and in a few minutes the witness heard the report of a gun in the direction the deceased had gone. The deceased was about twenty-five and the defendant about twenty-seven years old. The witness saw the deceased and the defendant together at the deceased's house, about three months before the killing. This was at a party given by the deceased. The defendant, his wife and step-daughter, the witness and her husband, Lum Anderson and others were present.

, Doctor Lipscomb testified, for the State, that the wounds on the deceased were in the shoulder and the side of the face and head, on the left side, and ranged diagonally backward. Either one of the several wounds was necessarily fatal. They caused the death of Pettis. The two roads said to have been traveled by the deceased and the defendant lead off from the front of Barham's house in the same general direction. One of them goes around by a negro church, and the two roads come together about twenty steps west from the point where Pettis was killed.

Mrs. Henry Vincent next testified, for the State, that she knew the defendant, and was slightly acquainted with the deceased in his life-time. On Sunday, about three months before the killing, the defendant came to the witness's house, bringing his double-barreled shot-gun with him, and remained about half the day. Being asked what he was doing with the shot-gun, he said that he was looking for a man whom he intended to kill. That man, he said, was Florence Pettis, and he intended to kill him. Witness's husband was present.

Cross-examined, the witness stated that, on the occasion spoken of, the defendant said that he was going to kill Pettis because Pettis had committed a rape on his step-daughter, Louisa Lawrence. He appeared very much excited over the treatment he had received at the hands of the deceased, and said that on the day before, while he was absent attending court, Pettis called at his house and left an insulting message for him.

Re-examined, the witness stated that about three months prior to the killing the deceased and the defendant took dinner together at the house of the witness. The defendant and his family went to a party at the deceased's house, and the deceased went to a party given by the defendant at his house. During the conversation alluded to, which occurred on April 3, 1882, at the house of the witness, the defendant said that the father of his step-daughter Louisa, John Lawrence, loaded his gun years ago to kill Pettis, and now that he, defendant, would have to do it. Witness asked him why, under the circumstances, he attended the party at Pettis's house, and received Pettis afterwards at the party at his, defendant's, house. Defendant replied that he then thought he would let the matter drop, but had reconsidered, and was going to "lift Pettis out of his boots." He said that the rape upon Louisa was committed prior to the two parties mentioned, and that he knew of it before those parties were given. The witness did not know whether or not the girl Louisa knew that the defendant accused the deceased of raping her. The meeting of the deceased and the defendant at the house of the witness, and the two parties mentioned, occurred some time about the holidays of Christmas, 1881.

Henry Vincent testified, for the State, that the defendant came to his house with a double-barreled shot-gun on Sunday about April 1, 1882. Witness asked him why, knowing it to be against witness's rules, he brought the gun into the house. He replied that he brought it because he was hunting a man whom he intended to kill. Witness asked him who he intended to kill. He declined to tell, saying the man might be warned and get the drop on him. Witness then pledged his word of honor not to disclose the name to any one, and the defendant said that Florence Pettis was the man he was going to kill; that Pettis had been running after his step-daughter, Louisa Lawrence; that he had intended killing him sooner, but was prevented by his wife and step-daughter. He said also, that on the previous day the deceased came to his house during his absence and pulled up his seed turnips.

During the Christmas week of 1881, both the deceased and the defendant were at the witness's house at a "fence raising," and assisted to build the fence. They were there all day, together with a number of others, but as the witness was off hauling rails, he could not say that they did or did not speak to each other during the day. On the next night the defendant and his family went with the witness's son and daughter-in-law to a party at the house of the

deceased, and on the following night the deceased and his family attended a party at the defendant's house.

Henry Bettis testified, for the State, that about six weeks before the killing of Pettis, he saw the defendant at his, the defendant's, cow pen, about fifty yards from his house. He had a gun, and said that he was expecting Florence Pettis there that night, and was going to kill him, for the reason that Pettis had been too intimate with his, the defendant's, step-daughter. He said that he would certainly kill Pettis as soon as he got the chance. Witness told Pettis of these threats soon after.

W. P. Wood next testified, for the State, that a week or two before the killing, the deceased and the defendant were in his store at Lyon's Station, trading, at the same time, on the same day. The witness could not say how close together they stood, nor did he know whether they spoke to each other. They had no altercation.

Mrs. Mary Terino, the widow of the deceased, and the present wife of Mr. Terino, was the next witness for the State. She testified that about the last of December, 1881, on Friday night, the defendant, his wife and step-daughter came with William Vincent and wife, to Pettis's house to a party. This was the night of the day after the fence raising at old man Henry Vincent's, which the deceased attended. The party lasted all night, and the defendant, his wife and daughter staid all night, dancing during the time, as did the deceased. On the Monday night following, the witness and her husband, the deceased, were invited to a party at the defendant's house, which they attended, staying and dancing all night. This party at the defendant's house, the witness thought, occurred on the night of January 2 or 3, 1882. The defendant and the deceased were on perfectly friendly terms at both of these parties. The witness did not know whether or not the defendant and the deceased met after these two parties prior to the killing. They lived some eight or nine miles apart. About six weeks before his death, Pettis, the deceased, was told by Henry Bettis that the defendant accused him, Pettis, of raping his, defendant's, step-daughter. The deceased was twenty-nine or thirty years old at the time of his death.

On her cross-examination, the witness said that the defendant's wife and Mrs. Mary Barham were aunts to her. The defendant was never at the house of the deceased, nor was the deceased ever at the house of the defendant, after the two parties mentioned, to the knowledge of the witness.

S. G. Wilson, sheriff of Burleson county, testified, for the State, that the defendant was first arrested for the murder of Pettis soon

after that event, but escaped from jail in a few months, and was gone until June, 1884, when he was recaptured at his home in Burleson county, Texas. On cross-examination this witness stated that when the defendant escaped from jail there was a general jail delivery, all the prisoners in confinement escaping. At the time of his recapture, it was the general understanding that the defendant was on his way to Caldwell to surrender, and was met at his house by some of the boys who wanted the reward for his recapture offered by the Governor.

The State rested, and the defendant offered in evidence his written statement made before the jury of inquest, which was excluded by the court. The action of the court, excluding this document, is the subject-matter of the first head-note of this report, and therefore, that it may be better understood, the document itself, omitting the formal parts, is here inserted. It is as follows:

" A short time after I was married, my little boy was taken by Florence Pettis, was beaten and cut twice, once in the temple and once on the upper lip, and left for dead. Some two years after this he came to my house, and tried to force my step-daughter. Then some two weeks after this he stayed at my house all night and tried to force her again. Then two weeks or thereabouts after this he and his wife came to my house and stayed all night. During the night he tried to force her again, this time with a pistol, and succeeded, and told her that if she made a noise or called her stepfather he would shoot her and him too as he came into the room. She then told him she would have him arrested. He said: 'If you do, I will give bond, and kill you both.' Along in January following this, I tried to get the girl to go to school. She said she would die first. Then I tried to get her to bring some water from the tank. She said that she was afraid; that she had heard that Florence Pettis was in the neighborhood again. I asked her what he had to do with it. She then told me all about it for the first time. I, from that time, was determined to put a stop to it. I have never been able to come up with him until yesterday. I met him in the road and told him I wanted to have a talk with him. He immediately threw his hand behind him, upon which I shot him. Before I met him in the road, however, I had seen him twice at Mr. Byrom's, but could not say anything to him on account of the family. I then started home as I could not get to speak to him, intending to meet him at or near Mr. Krohne's gate. After going some distance a deer came by. I followed it until I came to the road, when I met Florence Pettis, and then killed him as aforesaid.

    (Signed)                                        " S. GREENE."

The questions involved in the opinion were raised by the motion for new trial.

*W. K. Homan,* for the appellant. The court improperly excluded the written voluntary statement of defendant, made at the inquest on the next morning after the killing, and offered by defendant in explanation of his statements already proved by the State.

The only evidence of defendant's agency in the killing of Pettis was in his, the defendant's, declarations to Glenn, the justice of the peace, late in the evening of the day of the killing, which were proved by the State. The statement offered by defendant was made to the same witness, Glenn, on the next morning, and at the inquest held by Glenn as justice of the peace, over the body of Pettis.

One of the theories of the defense was that appellant killed Pettis on account of a rape committed by the latter upon the step-daughter of appellant, and under circumstances which would reduce the killing to manslaughter. It was contended by the prosecution, and testified to by one witness, that the appellant knew of the rape by Pettis prior to certain social gatherings occurring during the Christmas holidays of 1881, when it appears appellant and Pettis were friendly. Appellant first complained of the rape to the State's witness Glenn, in January, 1882, and first complained of Pettis as the guilty party in April, 1882. In his statement, excluded by the court, appellant said he first learned of the rape in January preceding the killing, and first met Pettis afterward at the time of the killing.

Some of the State's witnesses testified that Pettis and appellant had met about three months before the killing, but on cross-examination they fixed the meeting at the parties and "fence raising," which took place in the Christmas week of 1881. They lived eight or nine miles apart and did not visit each other after about the 3d of January, 1882.

It is submitted that, the State having proved the declarations of defendant as to the killing, and his statements that Pettis had raped his step-daughter, defendant was entitled to put in evidence, for the purpose of explaining his declarations introduced by the State, his statement made at the inquest. This becomes specially important in view of the controversy as to the time when the defendant first became aware of the outrage by Pettis upon his step-daughter, and as to whether the occasion of the killing was his first meeting with Pettis thereafter. (Code Crim. Proc., art. 751.)

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE.  I. Defendant was convicted upon his own voluntary confessions made on the day of the homicide.  He confessed to a justice of the peace that he had shot and killed the deceased; that he saw the deceased and called to him, and that deceased, who was on horseback, turned in his saddle, and threw his hand behind him, but said nothing, and that he, defendant, then shot him.  The homicide occurred June 2, 1882.  In January, 1882, defendant told this witness that two men had raped his, defendant's, step-daughter, and that he intended to kill them, but did not state who the men were.  In April, 1882, he told witness that the deceased had raped his step-daughter, and that he intended to kill him.  In his confession, made on the day of the homicide, he stated nothing about the rape of his step-daughter.  On the next day after the homicide an inquest was held by the witness to whom the confession had been made, and the defendant made a statement in writing on that occasion, in which, among other things, he stated that deceased had raped his step-daughter, and that he ascertained the fact in January, 1382, and that from that time he was determined to put a stop to it, but had never been able to come up with deceased until the day of the killing; that he had met deceased, however, on two previous occasions after he had ascertained about the rape, but could not say anything to him on account of the presence of the family at whose house he had met him.

Defendant offered this written statement in evidence in explanation of his said confession made the day previous, which, on objection made by the State's counsel, was rejected.  This written statement, it is contended by defendant's counsel, was admissible in evidence under authority of article 751 of the Code of Criminal Procedure, which reads as follows:  "When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; as where a letter is read, all other letters on the same subject between the same parties may be given.  And when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration, or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence."

This article expands the common law rule with reference to such evidence.  At common law, when a confession or admission is introduced in evidence against a party, such party is entitled to prove the whole of what he said on the subject *at the time of making such confession or admission.*  (1 Greenl. Ev., §§ 201–218; Whart. Cr. Ev., § 688.)  But the above quoted article does not restrict the ex-

planatory act, declaration, conversation or writing to the *time* when the act, declaration, conversation or writing sought to be explained occurred, but extends the rule so as to render such acts or statements admissible, if necessary to a full understanding of, or to explain the acts or statements introduced in evidence by the adverse party, although the same may have transpired at a different time, and at a time so remote even as to not be admissible as *res gestæ*.

This article of the Code has not heretofore been considered and construed with direct reference to the question we are now discussing. In the case of *Shrivers* v. *The State*, 7 Texas Ct. App., 450, the question was presented and discussed, but without reference to this article of the Code. In that case the statements made by the defendant, explanatory of the statements proved against him by the State, were held admissible as *res gestæ*, and the court said: "To render such after-declarations or statements admissible as explanations, it must appear that they were made recently after the former, and it must also be obvious from the circumstances that they are not obnoxious to, but come within the exceptions to, the general rule that a party cannot make evidence for himself either by his acts or his declarations." The rule thus stated would be correct when applied to declarations of the defendant offered in his own behalf as original evidence, and not in explanation of statements or confessions proved against him by the prosecution. (*Davis* v. *The State*, 3 Texas Ct. App., 91, and authorities there cited.)

But, in a case like this, where the statements offered are offered only in explanation of defendant's statements introduced in evidence against him by the State, we can find no warrant in the statute for thus limiting their admissibility. In so far as the language used in the opinion in Shrivers's case conflicts with the construction we now give to the article quoted, the same is overruled. We are of the opinion that under this article the statement of the defendant made before the inquest, if it be necessary to make his confession fully understood, or to explain the same, was admissible.

The question then is, Can the confession be fully understood without this statement; or does this statement explain the confession? All that we know from the confession is that the defendant saw the deceased riding along a road, and called to him to stop; that deceased made no reply, but turned in his saddle, threw his hand behind him, and defendant then shot and killed him. We fully understand from this that the defendant killed the deceased. But we are not informed why he called to the deceased to halt, or why he killed him. There is nothing in the confession which explains

the defendant's conduct, or which enables us to fully understand his apparently deliberate, unprovoked, and inhuman act. His statement made the next day, however, sheds light upon the tragedy. By that we are told that the defendant had been informed that his step-daughter had been ravished by the deceased; that since receiving such information he had sought to meet the deceased to have a talk with him about this matter, but had not before met him under such circumstances as rendered it proper to mention the subject, and that when he called to deceased to stop it was to have a talk with him, and he so stated to the deceased at the time, when deceased immediately threw his hand behind him, and then defendant fired upon him.

With this statement we fully understand the conduct of the defendant from his standpoint, and it certainly explains that conduct to some extent at least. We think he was entitled to have it submitted to the jury for their consideration, in connection with his confession made the day before, and upon which confession the State relied for a conviction. Its credibility, and the weight to be given to it, were matters for the jury to determine. By the jury it might be wholly disregarded, or it might be credited, and if credited might properly influence them favorably to the defendant, mitigating the punishment, or reducing the grade of the homicide. We are of the opinion that it was material error to reject this evidence, and for such error the judgment must be reversed and the cause remanded.

II. Several objections are urged by defendant's counsel to the charge of the court. Some of these objections are, in our opinion, well taken, but no exceptions to the charge were made at the time of the trial, and the errors complained of, and which are, in our opinion, well assigned, are not of a character that would require the conviction to be set aside; and as they are not likely to be repeated on another trial, we think it unnecessary to consume time in pointing out and discussing them.

III. It was improper for counsel for the prosecution in the concluding argument to state that if the defendant's step-daughter had been examined as a witness in the case, she would have testified to certain facts. Such statement was not warranted by the evidence; was not legitimate argument; and was not justified by anything said by counsel for the defendant in addressing the jury. It is unnecessary for us to determine whether we would set aside the conviction if this were the only error committed on the trial.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered January 14, 1885.]